**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **ROBERT BUCHANAN, JR.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11 C 5951** |
| | ) | |
| **MARCUS HARDY, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

An Illinois jury convicted Robert Buchanan Jr. of first-degree murder.  The trial judge sentenced him to a prison term of life without parole.  Buchanan has petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254.  He contends that his trial and appellate counsel rendered ineffective assistance and that the State violated his due process rights by not providing funds to enable him to hire a psychiatrist as a defense expert.  For the reasons stated below, the Court denies Buchanan's petition and declines to issue a certificate of appealability.

### Background

**A.     The murder of Wilma Buchanan**

On the night of October 1, 2002, Wilma Buchanan was at her home in Zion, Illinois.  She lived there with her three adult children, two of whom, Alicia Gomillia and Kenneth Gomillia, were also at the townhouse that night.  Wilma had spent the day packing up her belongings, because she and her children intended to move to

Arkansas the next day.

Between 11 p.m. and midnight, Robert Buchanan, Wilma's estranged husband, called Wilma approximately ten times. Wilma spoke with Buchanan but refused his requests that she come to see him.

At approximately 12:15 a.m. on October 2, 2002, Buchanan entered Wilma's townhouse by smashing down the back door. Kenneth, who had been downstairs, ran upstairs to warn his mother and Alicia, who were in Wilma's bedroom. After Kenneth entered the bedroom, Wilma and her children attempted to close the bedroom door, but Buchanan forced his way into the room. He was carrying a knife, and he grabbed Wilma and held the knife to her throat. Alicia picked up the phone to dial 911, but Buchanan told Wilma that "[i]f your daughter calls the police I will kill you." Resp. Ex. B at 1109; *see id.* at 1073. Alicia hung up the phone. Buchanan refused to let Wilma or her children leave the room, but while he was attempting to force Wilma into a closet in the bedroom, Alicia and Kenneth were able to flee.

Zion police officers Brian Fiene and Anthony Velardi responded to Alicia's aborted 911 call. They entered Wilma's house and went to the second floor. They took up positions outside the bedroom where Buchanan was holding Wilma, but they but did not enter. Buchanan repeatedly threatened to kill Wilma if the police entered the room and made Wilma repeat this threat to the police. He also began to throw furniture against the bedroom door to create a barricade.

The police stayed outside the bedroom for about twenty minutes. Fiene and Velardi were joined by Sergeant Timothy Bartlett, who had brought nonlethal "flashbang" stun grenades from the police station. At some point, the police heard the

2

sounds of a struggle from within the room, and someone opened the door a few inches from the inside. Police saw a bloody hand reach out from inside the bedroom. Bartlett attempted to kick the door in but found the door barricaded from the inside. The police were able to force the door open a foot or so, and they threw a stun grenade into the room. They were then able to open the door completely and remove Wilma, who was bleeding from multiple wounds. She had suffered twenty-one stab wounds and died later that day.

Buchanan was on the floor of the bedroom with a broken knife stuck in his chest. He resisted when officers tried to subdue him and had to be shocked twice by a Taser. At one point, Buchanan told the police to shoot him because he did not want to go back to jail. *Id.* at 1366. Police eventually handcuffed Buchanan to a stretcher so that he could be taken for medical treatment. As he was taken outside the home, he asked if Wilma was dead. *Id.* at 1441–42. Sergeant Terry Richards told Buchanan that Wilma would be fine. Upon learning this, Buchanan became agitated and started screaming and spitting on the police officers. *Id.* at 1430.

## B. Psychological examination and fitness hearing

An Illinois grand jury indicted Buchanan for first-degree murder committed with three different sentencing enhancements: murder of someone protected by an order of protection, murder during the course of a home invasion, and murder accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS 5/5-8-1(b); *see* 720 ILCS 5/9-1(a), (b)(6)(c), (b)(19). These sentencing enhancements, if proven, made Buchanan eligible for a sentence of life without parole.

The trial court gave permission for Buchanan to be evaluated by a psychologist, Dr. Michael Gelbort. Dr. Gelbort tested Buchanan and found that his IQ score was very low, in the range where he would be considered mentally retarded. The defense moved for a fitness hearing based on this evidence, but the trial court found that the evidence did not create a bona fide doubt as to Buchanan's fitness. The court did, however, continue the trial to allow Buchanan time to be evaluated by another psychologist.

The new psychologist, Dr. Alan Friedman, reported that he had doubts regarding Buchanan's fitness to stand trial. But he also wrote:

> I do not believe that I have reliable testing data based upon Mr. Buchanan's lack of cooperation. He tested in the range of persons with mental retardation. His full scale IQ fell eleven points below the testing level of Dr. Michael Gelbort, Ph.D. from eleven months ago. I cannot account for this drop in scoring other than by an inference that Mr. Buchanan was trying to produce a lower score on the IQ test. Similar low scores repeated on other assessments lead me to conclude that Mr. Buchanan was attempting to skew the data by looking as bad as possible.

Resp. Ex. C at 142. Dr. Friedman stated that he wanted to do additional testing to confirm or rule out the possibility that Buchanan was malingering, that is, exaggerating his mental incapacity for strategic reasons.

Based on Dr. Friedman's report, the defense again requested a fitness hearing. The trial court denied the motion, but appointed another psychologist, Dr. John Dunne, to examine Buchanan. In his report, Dr. Dunne stated that Buchanan's performance on two psychological tests, the TOMM (Test of Memory Malingering) and M-FAST (Miller Forensic Assessment of Symptoms Test), was "highly suggestive of malingering." *Id.* at 644. Dr. Dunne wrote that the M-FAST in particular is designed to detect whether a patient is malingering. Dr. Dunne also interviewed Buchanan. Buchanan told Dr.

Dunne that he could not remember killing his wife, experienced auditory hallucinations, did not know his lawyer's name, and had only a limited understanding of the trial process. Given the results of the tests, however, Dr. Dunne thought it more likely that Buchanan was feigning his symptoms and lack of understanding. He recommended that the court find Buchanan fit to stand trial. After receiving Dr. Dunne's report, the trial court ordered a fitness hearing before a jury. *See* 725 ILCS 5/104-12.

Shortly before the fitness hearing was to take place, Buchanan asked the trial court to provide him with funds to hire a psychiatrist as an expert. His attorney, Jed Stone, argued that a psychiatrist at the county jail where Buchanan was in custody had prescribed Haldol, an anti-psychotic drug, after Buchanan appeared to attempt suicide. Stone contended that a mentally healthy person would have been incapacitated by the drug but that Buchanan's behavior and comprehension of his circumstances had improved after he began taking it. Stone argued that Buchanan's reaction to the drug suggested that he was mentally ill and that an expert psychiatrist was necessary to testify about the effects of the drug. Stone also argued that the expert psychologists were unqualified to speak about psychotropic medications. The court denied the motion, noting that Buchanan had already retained two expert witnesses on the issues of fitness and sanity. Resp. Ex. B at 210.

At the fitness hearing, Dr. Dunne testified about his testing and interview of Buchanan. He also stated that he had reviewed Dr. Friedman's results and that Dr. Friedman had tested Buchanan with the TOMM and M-FAST as well. Dr. Friedman's results were similar to Dr. Dunne's and also suggested malingering.

The defense called Dr. Richard Wagner, the psychiatrist who had treated

5

Buchanan in the county jail.  Dr. Wagner stated that he had prescribed the anti-depressants Trazadone and Paxil for Buchanan, and that later, after the apparent suicide attempt, he had prescribed Haldol and then Risperdal, both anti-psychotic drugs.  Dr. Wagner testified that he gave Buchanan the anti-psychotics to help control his unstable mood and agitation.  He stated that Buchanan was currently confined to his cell for most of the day because of his bad behavior, and if the drugs helped him control his behavior, he would be allowed more freedom at the jail.  Dr. Wagner stated that he had never diagnosed Buchanan as psychotic.  He acknowledged that Buchanan had reported auditory and visual hallucinations to him, but it was his conclusion that Buchanan was malingering and not actually suffering from hallucinations.

The defense also called Lena Buchanan, Buchanan's mother, and Vermel Buchanan, his sister, to testify at the fitness hearing.  They testified that Buchanan had suffered head trauma twice in his childhood.  Specifically, he had been beaten with a broom handle when he was eight or nine and had been hit in the head with a lead pipe when he was fourteen or fifteen.  Vermel also testified that Buchanan drank to excess, often passing out, and used cocaine.

Following the hearing, the jury found Buchanan fit to stand trial.

**C.    Trial**

Buchanan's trial took place in January 2004.  In his opening statement, Stone conceded that Buchanan had stabbed Wilma while the two were barricaded in her bedroom, and he primarily argued that Buchanan was insane at the time of the crime.

One of the prosecution's witnesses was Tyrone Henderson, who had been Wilma's neighbor at the time of the murder.  Henderson testified that, on the night of

6

the murder, he had heard Buchanan say that he was going to kill Wilma. Henderson also testified that he heard Buchanan say that Wilma was "his for life" and that "[s]he wasn't going to make it" to Arkansas. *Id.* at 1135. Henderson testified that he had heard Buchanan make similar comments to Wilma frequently in the past.

At the outset of Henderson's testimony, the prosecution elicited from him that he had been convicted of two felonies. Henderson also admitted that he was testifying because he had been subpoenaed and that the prosecution was paying his expenses. On cross examination, Henderson stated that he had given a written statement to the police on February 24, 2003, more than four months after the murder. Henderson claimed that he had given the statement so late because he had been incarcerated, and he stated that he had also given a statement on the night of the murder but had refused to give his name because there was a warrant out for his arrest. The defense was able to impeach him, however, by calling the police detective to whom Henderson had given his written statement. The detective testified that Henderson had claimed at the time he just missed being interviewed by police because he had gone to a different apartment.

The day after Henderson testified, the defense moved for a mistrial, stating that the prosecution had not disclosed that Henderson had been convicted of the felonies. In particular, the defense stated that the prosecution had not previously disclosed that Henderson had been on probation for a DUI conviction when he first spoke to the police about Wilma's murder, had been sentenced to sixteen months in prison when his probation was revoked, and was on supervised release at the time of trial. All of these facts, the defense contended, gave Henderson a motivation to provide testimony

helpful to the prosecution and perhaps to lie.  The trial court concluded that the state

had violated its obligations to disclose impeachment evidence under *Brady v. Maryland*,

373 U.S. 83, 87 (1963), but did not order a mistrial.  Instead, the court ordered the

prosecution to make Henderson available to the defense for an interview and stated

that the defense could call him to testify to inquire into his motivations and whether he

had received any deal from the prosecution.

Stone was able to interview Henderson before the close of evidence, although

(as he told the trial judge) he was unable to talk to Henderson's attorney or the

prosecutor in Henderson's case to ascertain whether any negotiations had occurred

regarding his testimony.  Stone did learn that Henderson had failed a drug test while on

probation before he spoke to the police about what he claimed he had heard Buchanan

say and that Henderson had actually been held at the county jail for more than a month

at the same time that Buchanan was there.  Stone argued that these facts gave

Henderson both the motive and opportunity to testify falsely.  Stone elected, however,

not to call Henderson back as a witness to present these facts to the jury.

The defense put on evidence that Buchanan drank heavily and used drugs and

that he had twice suffered head wounds as a child.  Stone did not call any of the

psychologists who had examined Buchanan.  There was also no witness to testify about

the medications that Dr. Wagner had prescribed for Buchanan or about their effects

and uses.  At the end of the defense case, Stone indicated to the trial court that

Buchanan would not testify.  The court had the following discussion directly with

Buchanan:

The Court:    . . . Mr. Buchanan, as you just heard, your attorney rested and indicated that they were not calling any additional witnesses.  You have talked with your attorney about your right to testify, have you not?

Mr. Buchanan:        Yes.

The Court:    And he explained to you that is a decision that you make in this case. And you understand that?

Mr. Buchanan:        Yes.

The Court:    And as a result of your discussions, you're not going to testify, is that correct?

Mr. Buchanan:        Due to the fact that I'm receiving medication, I feel that it would be in the best interest of my attorney to make those decisions for me.

The Court:    Very well.  But you understand that it is your decision to make?

Mr. Buchanan:        Yes, sir.

The Court:    And you do not wish to testify, is that correct.

Mr. Buchanan:        No, sir.

The Court:    That is not correct?  Is that correct?

Mr. Buchanan:        That is correct.

Resp. Ex. B. at 1536–37.

Over the objection of defense counsel, the trial court did not give instructions allowing the jury to find Buchanan insane or guilty but mentally ill.  During closing arguments, Stone effectively conceded that Buchanan was guilty and primarily argued that the jury should not find any of the aggravating factors.  He also attacked the testimony of Henderson, by referring to him as a convicted felon and noting that he had lied on the stand regarding whether he had given a statement to police on the night of

9

the murder.

On January 30, 2004, the jury found Buchanan guilty of first-degree murder and also found all three aggravating factors. On March 4, 2004, the trial judge sentenced Buchanan to a prison term of life without the possibility of parole.

## D.    Appeal and post-conviction proceedings

Buchanan appealed his conviction, arguing among other things that the trial court had violated his due process rights and abused its discretion by denying his request for funds to hire a psychiatrist. He argued that the evidence of brain damage and substance abuse, as well as the psychotropic drugs that he was taking, required a psychiatrist to assess whether he was fit to stand trial or insane at the time of the crime. He also contended that the psychologists who had examined him were insufficient, because they were not medical doctors, as a psychiatrist would be, and lacked knowledge of psychotropic drugs or organic brain injury.

The Illinois appellate court affirmed Buchanan's conviction and sentence. It held that Buchanan had two psychologists and the psychiatrist who had prescribed his medications available to testify about his mental condition, and that his real problem was not a lack of access to mental health experts but the fact that all of the experts who had examined him believed that he was malingering. Buchanan filed a petition for leave to appeal (PLA) with the Illinois Supreme Court, which denied the petition.

Buchanan then filed a *pro se* petition for post-conviction relief in state court. He argued that his trial and appellate counsel had been constitutionally ineffective in a number of ways. Among other claims, he contended that (1) his appellate counsel was ineffective for not arguing that the prosecution had violated *Brady* by not turning over

evidence about Henderson's criminal history during the discovery process; and (2) his trial counsel had been constitutionally ineffective for advising him not to testify at trial. In support of the second claim, Buchanan filed an affidavit in which he stated that his trial counsel had advised him not to testify because it might hurt his appeal and cause the trial court to give him a harsher sentence. The trial court found that Buchanan's petition was not frivolous and appointed counsel, who asserted in a supplemental petition several more claims that Buchanan's trial counsel was constitutionally ineffective. The prosecution moved to dismiss the post-conviction petition, and the trial court dismissed it.

Buchanan appealed the dismissal. He pursued only two ineffective assistance claims: appellate counsel's failure to make a *Brady* claim and trial counsel's advice not to testify. The Illinois appellate court rejected both claims. *See People v. Buchanan*, 403 Ill. App. 3d 600, 935 N.E.2d 603 (2010). On the *Brady* claim, the court held that if appellate counsel was ineffective, there was no prejudice. On the claim that trial counsel was ineffective, the appellate court held that Stone's performance was not deficient because he had honestly assessed Buchanan's situation and informed him of potential consequences of testifying. The court also held that Buchanan had not shown a reasonable probability that the result of his trial would have been different if he had testified. Buchanan filed a PLA with the Illinois Supreme Court, which denied the petition.

### Discussion

A person convicted in state court may obtain a writ of habeas corpus on a claim

that was adjudicated on its merits in state court only if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010). A state court decision is contrary to clearly established federal law if "the state court applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts." *Woods v. Schwartz,* 589 F.3d 368, 377 (7th Cir. 2009) (brackets and internal quotation marks omitted). A decision "is an unreasonable application of clearly established federal law if it correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case." *Id.* at 378 (internal quotation marks omitted). The petitioner must show that the state court's decision "was so erroneous as to be objectively unreasonable." *Id.* (internal quotation marks omitted). Finally, a state court decision is considered to be based on an unreasonable determination of the facts in light of the evidence presented if the petitioner is able to rebut, by clear and convincing evidence, the presumption of correctness that applies to state court fact-finding. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

Buchanan asserts three claims in his habeas corpus petition: (1) he was denied due process when the trial court refused to grant him funds to retain an expert psychiatrist; (2) his trial counsel rendered ineffective assistance when he advised

Buchanan not to testify; and (3) his appellate counsel rendered ineffective assistance when he failed to pursue a *Brady* claim in Buchanan's direct appeal.

## A.     Refusal to appoint psychiatrist

Buchanan contends that the trial court violated his due process rights by refusing to grant Buchanan funds for a psychiatrist, even though several psychologists had examined Buchanan and concluded that he was malingering.

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.  This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.

*Ake v. Oklahoma*, 470 U.S. 68, 85 (1984).

The Illinois appellate court recognized that due process required that Buchanan have access to expert assistance on the issues of fitness and sanity.  It ruled, however, that Buchanan had not been denied due process.  It stated:

> [E]ven defendant's own expert psychologists, and his treating psychiatrist, who appeared as defendant's witness at the fitness hearing, opined that defendant was malingering and was not really psychotic.  Defendant had three doctors, including a psychiatrist, who could testify regarding his condition.  His problem was not a lack of access to experts, but rather the fact that none of the treating experts supported his defense theory.

Resp. Ex. A at 10.

The court's application of *Ake* to the facts was not unreasonable.  Dr. Friedman, the psychologist retained by Buchanan, concluded that Buchanan was attempting to skew his performance tests so that he looked as bad as possible.  Dr. Friedman also recommended additional testing to confirm or rule out malingering.  Resp. Ex. C at 142.

Dr. Dunne, the psychologist appointed by the trial court, also concluded that Buchanan was malingering and stated that the tests he performed had very similar results to those performed by Dr. Friedman. *Id.* at 644–45; Resp. Ex. B at 478–79. Dr. Wagner, the psychiatrist who prescribed anti-depressants and anti-psychotics for Buchanan and treated him while he was in jail, testified that he did not think that Buchanan was psychotic and that he believed that Buchanan was malingering when he claimed auditory and visual hallucinations. Resp. Ex. B at 561, 568.

Under Illinois law, a defendant has the burden of showing insanity by clear and convincing evidence. *Wilson v. Gaetz*, 608 F.3d 347, 356 (7th Cir. 2010). Given this burden and the conclusions of the experts who did examine Buchanan, the Illinois appellate court did not act unreasonably when it concluded that Buchanan was not denied due process by the trial court's refusal to grant him funds to retain an expert psychiatrist. The court's conclusion was, in effect, that Buchanan was not prejudiced given all the circumstances, and this was a reasonable conclusion. *See Ake*, 470 U.S. at 78–79 (state need provide only one psychiatric examination); *United States v. Mikos*, 539 F.3d 706, 712 (7th Cir. 2008) (in a federal criminal case, stating that constitution does not entitle defendant "to more than one expert if the first does not reach a conclusion favorable to the defense"); *Stewart v. Gramley*, 74 F.3d 132, 134 (7th Cir. 1996) (denial of psychiatrist at trial could not be prejudicial error when defendant was examined by psychiatrists multiple times after trial and they never concluded that he had a serious psychiatric disorder).

Buchanan contends that all of the experts who examined him judged his fitness to stand trial, not the distinct question of whether he was sane at the time of the murder.

An examination of a defendant for fitness to stand trial is different from an examination to determine the defendant's sanity at the time of the crime. *Schultz v. Page*, 313 F.3d 1010, 1017 (7th Cir. 2002); *see Wilson*, 608 F.3d at 349–50. It is not entirely clear whether Buchanan's contention is accurate, because the state trial court, in denying his motion for funds to hire a psychiatrist, stated without contradiction from the defense that Buchanan's expert psychologists had examined him for both fitness and sanity. Resp. Ex. B at 210. That aside, however, the Illinois appellate court reasonably concluded that Buchanan was not prejudice and his due process rights were not infringed by the absence of additional sanity examinations, because the experts who had examined Buchanan concluded that he was malingering.

Buchanan's situation is distinguishable from cases in which courts have held that a defendant's due process rights were violated because the court did not provide a psychiatrist. In *Ake*, Ake's behavior at arraignment "was so bizarre as to prompt the trial judge, *sua sponte*, to have him examined for competency." *Ake*, 470 U.S. at 86. A psychiatrist found that Ake was not fit to stand trial, and he was eventually rendered fit only by weeks of treatment in a mental hospital and large doses of Thorazine administered three times a day. *Id.* The psychiatrists who examined him for fitness thought that his mental illness may have begun years before the commission of the crime with which he was charged. *Id.* Finally, prosecutors in Ake's case sought the death penalty, and they argued that his mental illness meant that he would be dangerous in the future. *Id.* All of this meant that Ake was entitled to an expert on the issue of sanity at trial. Buchanan, by contrast, was not found unfit to stand trial and was

not treated in a mental hospital, and the multiple experts who examined him concluded that he was malingering.

Similarly, in *Schultz*, the Seventh Circuit held that an examination by a psychiatrist for fitness was insufficient to satisfy *Ake* when insanity was an issue at trial. *Schultz*, 313 F.3d at 1017.  In that case, however, Schultz had been hospitalized for mental illness two years before trial.  *Id.* at 1013.  Further, the psychiatrist who examined Schultz stated that his reported hallucinations could be the result of brain injury.  *Id.*  The psychiatrist, who was appointed the day before the fitness hearing, also stated that he would have performed more tests if given time and that a neurological examination of Schultz might be necessary.  In the current case, by contrast, all of the experts who examined Buchanan concluded only that he was malingering.

**B.      Trial counsel ineffectiveness**

Buchanan contends that his trial counsel was ineffective when he advised Buchanan not to testify because it could cause the trial court to give him a harsher sentence and might hurt his chances on appeal.  Buchanan argues that counsel effectively abandoned any chances of winning at trial by advising him not to testify, particularly because without any experts, only Buchanan's own testimony and circumstantial evidence could support an insanity defense.

A defendant claiming ineffective assistance of counsel must show that his attorney's performance was deficient and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An attorney's performance is deficient if it falls "below an objective standard of reasonableness."  *Id.* at 688.  The

defendant is prejudiced if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Illinois appellate court considered Buchanan's ineffective assistance claim in his appeal from the dismissal of his state post-conviction petition. It utilized the *Strickland* standard and concluded that Buchanan had not demonstrated either deficient performance or prejudice. Regarding trial counsel's advice, the court stated:

> Defendant has offered nothing to indicate that this was anything other than trial counsel's honest assessment of defendant's case, properly informing defendant of the potential consequences should he choose to exercise his right to testify. Nor does defendant offer anything that would indicate that trial counsel's assessment of the impact of defendant's testimony was erroneous or incomplete.

*Buchanan*, 403 Ill. App. 3d at 607–08, 935 N.E.2d at 611. The court also stated that Buchanan had not shown prejudice because he did not state what his testimony would have been and there was overwhelming evidence that he had killed Wilma. *Id.* at 608–09, 935 N.E.2d at 611.

The Illinois appellate court's determination that Buchanan's trial counsel's performance had not been deficient was not unreasonable. According to Buchanan, trial counsel advised him that it would be best not to offer his testimony because it could hurt his appeal and might lead to an increased sentence. "It is well established that [a court's] scrutiny of counsel's trial strategy is to be deferential and that [the court does] not second guess the reasonable tactical decisions of counsel in assessing whether his performance was deficient." *Johnson v. Thurmer*, 624 F.3d 786, 792 (7th Cir. 2010).

Trial counsel's tactical decision—more specifically, his tactical advice—was not unreasonable. Buchanan could have testified to bolster his insanity defense (though he failed to describe to the state court what his testimony would have been and how it would have helped). The prosecution, however, could have called in rebuttal any of the three mental health experts who had examined Buchanan, to offer their conclusions that he was malingering. Further, if Buchanan said anything other than that he could not remember the events of the murder, he could have been impeached by testimony from Dr. Dunne, who Buchanan had told during their interview that he did not remember anything about the murder. Resp. Ex. C at 643. Given the limited value on the question of sanity of any testimony that Buchanan might have given, trial counsel's advice that it would be better for Buchanan not to testify did not fall below an objective standard of reasonableness.

For similar reasons, even if trial counsel's advice was deficient, Buchanan cannot show prejudice. The Illinois appellate court reasonably concluded that Buchanan's testimony could not have changed the results of the trial because there was overwhelming evidence of his guilt. *Starkweather v. Smith*, 574 F.3d 399, 405 (7th Cir. 2009). Buchanan now claims that his testimony would have helped establish his insanity defense. But any testimony regarding sanity would have been subject to rebuttal by the experts who had examined Buchanan and testified at the fitness hearing that he was malingering.

Buchanan claims that he was denied his right to testify because his attorney coerced him not to testify. But though Buchanan states in his affidavit that he wanted to testify but did not do so after receiving his attorney's advice, he does not state that his

18

attorney failed to inform him of his right to testify or that the attorney told him that he could not testify.  In addition, the state trial court addressed Buchanan specifically, making it clear that Buchanan knew he had a right to testify and that it was his decision and not his attorney's.  Resp. Ex. B at 1536–37; *see Starkweather*, 574 F.3d at 404–05 (finding no constitutional violation when trial counsel and court had advised defendant that he had the right to testify).

Buchanan also cites two cases in which courts found that trial counsel had rendered ineffective assistance by abandoning a defense.  The cases, however, are distinguishable.  In *Brennan v. Blankenship*, 472 F. Supp. 149 (W.D. Va. 1979), the defendant's trial attorneys did not present the testimony of a psychiatrist who had reported that the defendant was not fit to stand trial and was prepared to testify that the defendant was a schizophrenic and did not understand his actions at the time he shot the victim.  *Id.* at 151–54.  Buchanan's trial counsel, by contrast, had no expert who could give favorable testimony and merely decided that it would be best not to offer the testimony of a defendant that would be contradicted by every expert who had examined him.  In *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991), defense counsel told the jury during closing arguments that there was no reasonable doubt on any relevant fact and told them that they should never feel guilty about their decision to find his client guilty.  *Id.* at 1071.  *Swanson* did not involve a failure to present evidence or counsel's deficient advice to the defendant regarding testifying, as Buchanan argues that his case does.

**C.  Appellate counsel ineffectiveness**

Buchanan's final argument is that his attorney on his direct appeal was
ineffective for failing to raise a *Brady* claim related to the prosecution's failure to turn
over before trial evidence that might have impeached the testimony of Henderson.

> Appellate counsel's performance is similarly measured against that
> of an objectively reasonable attorney.  An appellate counsel's
> performance is deficient if she fails to argue an issue that is both obvious
> and clearly stronger than the issues raised. . . .
>
>     To prevail, [petitioner] must show that there is a reasonable
> probability that the issue his appellate attorney failed to raise would have
> altered the outcome of the appeal, had it been raised.

*Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010) (citations omitted).

> A *Brady* violation can be broken down into three basic elements: (1) the
> evidence at issue is favorable to the accused, either being exculpatory or
> impeaching; (2) the evidence must have been suppressed by the
> government, either willfully or inadvertently; and (3) there is a reasonable
> probability that prejudice ensued—in other words, materiality. . . .
> Evidence is material if there is a reasonable probability that, had the
> evidence been disclosed to the defense, the result of the proceeding
> would have been different.

*Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008) (citations and internal
quotation marks omitted).

The Illinois appellate court rejected Buchanan's ineffective assistance of
appellate counsel claim by holding that Buchanan was not prejudiced.  The court
understood Buchanan to assert that Henderson was the only witness who testified that
Buchanan said that Wilma was "his for life" and would never make it to Arkansas.
*Buchanan*, 403 Ill. App. 3d at 604, 935 N.E.2d at 608.  Buchanan argued that this
testimony showed that he "acted 'lucidly and with a jealous heart.'" *Id.*  The court
rejected this argument.  It stated that even if Buchanan had discredited Henderson's

testimony he still had not presented enough evidence to warrant giving the jury instructions on the issues of insanity and guilty but mentally ill. *Id.* at 604–05, 935 N.E.2d at 608–09. Buchanan also argued that Henderson's testimony allowed the jury to find that the murder was exceptionally brutal and heinous, one of the aggravating factors that made Buchanan eligible for a sentence of life without parole. The court stated that the testimony was harmless in this regard as well because there was a great deal of other evidence that showed that the murder had been exceptionally brutal. *Id.* at 605–06, 935 N.E.2d at 609. The Illinois appellate court found that the failure to disclose the *Brady* material earlier was harmless, and thus Buchanan could not show the prejudice required for his ineffective assistance claim.

The Illinois appellate court's application of *Strickland* and *Brady* to the facts of this case was not unreasonable. Henderson testified that he heard Buchanan say that Wilma was "his for life," that she would never leave him, and that she would not make it to Arkansas. Resp. Ex. B at 1135. But even if Henderson's testimony had been completely discredited by the impeachment evidence, numerous other witnesses testified that Buchanan made threats to kill Wilma and otherwise indicated that he knew what he was doing. Wilma's daughter Alicia testified that Buchanan threatened to kill Wilma to get Alicia to stop dialing 911 and that he refused to let her or her brother Kenneth leave the bedroom. *Id.* at 1109–10. Kenneth testified that Buchanan threatened to kill his mother if she called 911. *Id.* at 1073. He also testified that while Buchanan had all three of them trapped in the room, Buchanan called his relatives to tell them "that he loved them very much." *Id.* at 1085.

Similarly, the testimony of the police officers who responded to 911 call established, independently of Henderson's testimony, that Buchanan threatened to kill Wilma and knew what he was doing. All three police officers stationed in the hallway outside the bedroom testified that over a period of fifteen or twenty minutes Buchanan repeatedly told them to leave or he would kill Wilma, and that he made Wilma give them the same warning. *Id.* at 1204–05, 1311–12, 1348–49. They also testified that during the standoff, Buchanan threw furniture against the door to barricade himself and Wilma in the room. *Id.* at 1212, 1217, 1313, 1350–51. Later, minutes after Buchanan had stabbed Wilma and while police were trying to subdue him, Officer Velardi testified that Buchanan told the police to just shoot him because he did not want to go back to jail. *Id.* at 1366. Two police officers testified that as Buchanan was being transported from the house to a waiting ambulance, he asked if Wilma was dead. *Id.* at 1331, 1441. When one of them told Buchanan that she was going to be fine, he became agitated and started screaming. *Id.* at 1331–32, 1430.

Given all of this testimony, even if Buchanan had been able to use Henderson's criminal history to completely discredit him, the result of the trial would not have changed. *See United States v. Wilson*, 481 F.3d 475, 481 (7th Cir. 2007) ("Undisclosed impeachment evidence would not produce a different result if the testimony of the witness against whom it is offered was strongly corroborated by other evidence."). Because the impeachment evidence was not material under *Brady*, Buchanan's appellate attorney's failure to raise the *Brady* claim did not prejudice him.

In addition, Buchanan and his trial counsel Stone learned of Henderson's

criminal history before the trial was over. Even though the prosecution should have disclosed this evidence far sooner, "[l]ate disclosure does not itself constitute a *Brady* violation." *United States v. Warren*, 454 F.3d 752, 760 (7th Cir. 2006). During Henderson's testimony, Stone learned that Henderson had two felony convictions, and Henderson volunteered, in response to a question from Stone, that there had been a warrant for his arrest. Resp. Ex. B. at 1130, 1144. Stone investigated this information further and moved for a mistrial the next day. The state trial court did not grant a mistrial. It did, however, order the prosecution to make Henderson available for an interview by the defense and told the defense that it could call him back to the stand to explore whether he had been promised anything for his testimony.

Before the close of the evidence, Stone interviewed Henderson and learned that he failed a drug test before his initial statement to police in the Buchanan case and faced a six-year prison sentence for violating the terms of his probation. Resp. Ex. B. at 1543. Stone also learned that Henderson was, at the time he testified against Buchanan, on conditional discharge from a prison sentence for violating the terms of his probation. Stone was also able to review the transcript of the proceeding in which an Illinois court revoked Henderson's probation. *Id.* at 1544–45. Stone declined to call Henderson to put any of this information in front of the jury, even after the trial court offered him the chance to do so. *Id.* at 1546. Instead, he chose to attack Henderson's testimony in his closing argument by reminding the jury that Henderson was a convicted felon and had lied about when he gave his initial statement to the police. *Id.* at 1661.

Although defense counsel was not able to speak to Henderson's public defender or subpoena the prosecution's files on Henderson on his other criminal cases, counsel

learned of Henderson's criminal history and motivation to lie in time to use the information to impeach his testimony.  There was therefore no prejudice from a *Brady* violation.  Accordingly, the failure of appellate counsel to raise the issue on direct appeal did not prejudice Buchanan.  *See United States v. Knight*, 342 F.3d 697, 705–06 (7th Cir. 2003) (no actionable *Brady* violation because disclosure of witness criminal history and plea agreements during complex drug conspiracy trial still gave defense time to use evidence); *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (no actionable *Brady* violation when defendant received impeachment information with time to use it in his defense).

**D.      Certificate of appealability**

When a district court enters a final judgment adverse to a habeas corpus petitioner, it must issue or deny a certificate of appealability (COA).  Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.  To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner must show "that reasonable jurists could debate whether (or . . . agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Given the deferential standard of review applied to state court merits determinations in a habeas corpus proceeding, the issues Buchanan asserted are not close.  The Court therefore declines to issue a certificate of appealability.

**Conclusion**

For the reasons stated above, the Court denies Buchanan's habeas petition and declines to issue a certificate of appealability.  The Clerk is directed to enter judgment in favor of the respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 22, 2012